IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CKSJB HOLDINGS, LLC, successor in interest to POINTSOURCE, LLC, | |
| Plaintiff, | CIVIL ACTION NO. 18-cv-2173 |
| v. | JURY TRIAL DEMANDED |
| EPAM SYSTEMS, INC., | |
| Defendant. | |

## AMENDED COMPLAINT

Plaintiff CKSJB Holdings, LLC, successor in interest to PointSource, LLC, by and through its undersigned counsel, hereby files this Amended Complaint against Defendant EPAM Systems, Inc. ("EPAM") and avers in support as follows:

1.     In January 2017, EPAM executed a letter of intent which set forth the negotiated terms by which EPAM intended to "work diligently" to acquire substantially all of the assets of PointSource.  After making substantial progress toward completing the transaction—including extensive due diligence that revealed no problems—EPAM repeatedly insisted PointSource treat the deal as if it was done.  The parties exchanged drafts of the purchase agreement and scheduled closing.  They began integrating employees and business objectives.  EPAM repeatedly assured PointSource no impediments existed to prevent closing.  Abruptly and unexpectedly, in April 2017, EPAM unilaterally halted negotiations and withdrew from the transaction.  PointSource now seeks redress for EPAM's failure to negotiate in good faith, its bad faith termination of negotiations, its refusal to work diligently to complete the deal, its disclosure of confidential information to a third-party, and its inducement of PointSource to rely on EPAM's unfulfilled promises.

1

## PARTIES

2.      At all times relevant to this Amended Complaint, PointSource, LLC

("PointSource") was a Florida limited liability company that maintained a principal place of

business at 6601 Six Forks Rd., Suite 200, Raleigh, North Carolina 27615.

3.      CKSJB Holdings, LLC ("CKSJB") is a Florida limited liability company that

maintains a principal place of business at 6601 Six Forks Rd., Suite 200, Raleigh, North Carolina

27615.

4.      As of September 19, 2016, PointSource was owned by Christopher L. Hugill and

Kassandra L. Hugill, as tenants by the entireties, and Kevin S. Hugill.

5.      On or about May 23, 2017, in anticipation of its acquisition by Globant SA

("Globant"), PointSource was restructured for tax purposes.

6.      As part of the restructuring, CKSJB was created and became the 100% owner of

PointSource.

7.      CKSJB, like PointSource, is 100% owned by Christopher L. Hugill and

Kassandra L. Hugill, as tenants by the entireties, and Kevin S. Hugill.

8.      On May 23, 2017, PointSource executed an Assignment of Chose in Action and

assigned to CKSJB for its use and benefit "all claims, demands and cause of action of

whatsoever kind and nature that Pointsource, LLC have had, now had or may have against

EPAM Systems, Inc." A true and correct copy of the Assignment of Chose in Action is attached

as Exhibit "A."

9.      The Assignment further recites that it was made "[i]n exchange for value

received." Exhibit "A."

10.     PointSource had the lawful right and authority to make the Assignment of Chose in Action. *See* Exhibit "A."

11.     By the Assignment, CKSJB became and is the successor in interest to PointSource for all claims, demands, and causes of action in this Amended Complaint.

12.     On or about June 1, 2017, PointSource was acquired by Globant.

13.     Defendant EPAM Systems, Inc., upon information and belief, is a corporation organized and existing under the laws of the State of Delaware that maintains a principal place of business and its global headquarters at 41 University Drive, Suite 202, Newtown, PA 18940.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendant are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because EPAM resides in this district, EPAM's principal place of business is in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

**A.     EPAM Conducts a Detailed Review of PointSource to Determine if PointSource is a Viable Acquisition**

16.     PointSource is a tech firm that develops digital strategies, implements mobile marketing, and creates transformative digital solutions.

17.     In 2016, PointSource began looking for a buyer to infuse cash and help the company grow its business and meet its strategic goals.

18.     Through those efforts, PointSource was introduced to many companies, several of which showed substantial interest in purchasing PointSource.

3

19.     One of the companies to express interest was EPAM, a software development company that was acquiring companies in PointSource's industry.

20.     PointSource and EPAM discussed a potential acquisition and EPAM expressed serious interest in a transaction with PointSource.

21.     EPAM prepared and sent to PointSource a mutual confidentiality agreement (the "Confidentiality Agreement").

22.     On September 7, 2016, EPAM and PointSource executed the Confidentiality Agreement, which confirmed EPAM's interest in examining certain non-public, confidential information pertaining to PointSource's business "for the purpose of evaluating the possibility of a transaction between the parties."    A true and correct copy of the Confidentiality Agreement is attached as Exhibit "B."

23.     Pursuant to the Confidentiality Agreement, EPAM and PointSource "agree[d] not to disclose to any third party: (a) the existence or contents of this Agreement; (b) the fact that the parties are evaluating the possibility of a transaction; or (c) the status of any such evaluation or possible transaction." The Confidentiality Agreement further provided: "The Information, the fact that information has been provided, and the status of any discussions or negotiations that are or may be occurring regarding a potential transaction will be kept confidential and subject to the terms of this Agreement by each recipient and its Representatives for three years from the date of disclosure or such longer period required by law." Exhibit "B."

24.     After signing the Confidentiality Agreement, EPAM evaluated PointSource's value to determine if EPAM wished to enter negotiations to acquire PointSource.

25.     As part of this evaluation process, PointSource provided EPAM with a comprehensive and confidential information memorandum, which included detailed information

4

concerning PointSource's business structure, operations, market positioning, customer case studies, and financials.

26.     PointSource provided EPAM full access to a pre-diligence dataroom that contained detailed financial information, customer and employee data, and other relevant documentation.

27.     EPAM and PointSource held a telephone call between senior management so that EPAM could ask questions about PointSource's business.

28.     After the management call, EPAM expressed further interest in acquiring PointSource and pursuing negotiations.  EPAM and PointSource consequently held a half-day, in-person meeting at PointSource's Raleigh, North Carolina headquarters.  The meeting was attended by EPAM's President and CEO, Arkadiy Dobkin, and Co-Head of Global Delivery, Victor Dvorkin.

29.     EPAM and PointSource held three additional in-person meetings in late 2016 including meetings in New York and Raleigh with EPAM's technology leadership team and other executives.

30.     Although the Confidentiality Agreement said EPAM had no obligation to enter into further negotiation or agreement with PointSource, after reviewing the confidential materials in the pre-diligence dataroom and holding multiple meetings with PointSource's executives, EPAM elected to continue negotiations with PointSource and issued a letter of intent, which set forth the material terms by which it proposed to purchase PointSource.

31.     From this point forward, EPAM consistently and unambiguously expressed its intent and promise to negotiate diligently and in good faith to complete the purchase.

B.     **EPAM Executes a Letter of Intent for the Acquisition of PointSource**

32.     On December 29, 2016, following the conclusion of EPAM's vetting process, PointSource emailed EPAM and said PointSource was "still awaiting your offer as EPAM remains our preferred partner."  EPAM responded: "You will have it in about an hour."

33.     Later that day, EPAM emailed PointSource and said "[w]e can offer the following terms (not binding at this point): $24M on closing with 70% in cash and 30% in stock . . . Post-closing 'Purchase price adjustment' based on 2017 results . . .".  The December 29, 2016 email included a detailed breakdown of how the post-closing "purchase price adjustment" would be calculated.

34.     On January 10, 2017, EPAM sent PointSource a draft of a formal and specifically tailored letter of intent.

35.     PointSource received letters of intent from other companies.  Before proceeding further into negotiations with any company, PointSource demanded an assurance that the pricing and deal structures proposed in the letters of intent reflected realistic, good faith offers.  To assuage PointSource's fear of not finding a serious contracting partner, PointSource called EPAM's President and CEO to inquire about EPAM's intention to negotiate in good faith and to acquire PointSource pursuant to the terms in its letter of intent.

36.     EPAM's President and CEO assured PointSource that EPAM was fully committed to the transaction and, to induce PointSource to choose to move forward with EPAM, expressly agreed with PointSource to work diligently and to negotiate in good faith to complete the deal described in EPAM's proposal.

37.     EPAM and PointSource spoke about and negotiated EPAM's proposed terms.  PointSource agreed to most of the terms set forth in EPAM's LOI, but requested that EPAM

adjust the carve-outs and allocations to PointSource's key personnel.  EPAM agreed to

PointSource's proposed changes.

38.     PointSource returned a redlined version of the letter of intent on January 15, 2017,

which reflected the changes agreed to by EPAM.

39.     On January 19, 2017, EPAM executed the Letter of Intent (the "LOI").  A true

and correct copy of the LOI is attached as Exhibit "C."

40.     The LOI did not require immediate exclusivity from PointSource, but provided

that "as we move forward, we may require a commitment of exclusivity by the Company and the

sellers through the date of execution of the Purchase Agreement."  Exhibit "C."

41.     On January 19, 2017, immediately after receiving the executed LOI from EPAM,

PointSource emailed EPAM to express its understanding of the parties' mutual commitment to

the transaction.  PointSource informed EPAM that it planned to stop discussions with other

companies and decline other offers, in reliance on EPAM's promises:

> Thank you for the executed LOI, we are excited to move forward.  Although the
> agreement doesn't call for immediate exclusivity, we intend to move forward
> solely with EPAM.  We are stopping discussions with all other companies, and
> are excited to enter due diligence.  Please let us know next steps.

42.     EPAM did not object to PointSource's decision to terminate discussions with

other companies or suggest any intention not to negotiate diligently and in good faith to complete

the deal contemplated by the LOI.

43.     EPAM did not tell PointSource its reliance on EPAM was misplaced or in any

way inappropriate.

44.     In all ways, EPAM continued to manifest and communicate to PointSource its

intention to abide by the parties' mutual agreement to negotiate diligently and in good faith.

4824-9086-0154

45.     In reliance on EPAM's commitment to the transaction, in consideration of the terms set forth in the LOI, and because of the progress made with EPAM and the parties' mutual commitment to EPAM acquiring PointSource, with the knowledge and encouragement of EPAM, PointSource declined purchase offers from other companies and elected to move forward exclusively with EPAM.

46.     The LOI was of substantial value to EPAM.

47.     The executed LOI established a framework for the parties' continued negotiations and reflected the material terms of the proposed acquisition, as agreed to by EPAM and PointSource. The LOI emphasized that PointSource was a strong strategic fit for EPAM's business. *See* Exhibit "C."

48.     The parties intended the LOI both to continue and to re-establish their mutually binding agreement to negotiate diligently and in good faith to complete a final purchase agreement based on the material terms set forth in the LOI.

49.     The LOI stated: "EPAM Systems, Inc. ("EPAM") is pleased to provide this non-binding indication of interest to acquire substantially all of the assets of PointSource LLC (together with any subsidiaries, "PointSource" or the "Company") under the terms set forth in this letter." Exhibit "C."

50.     In the LOI, EPAM provided its proposed valuation for PointSource: "EPAM would pay the purchase price in two tranches, with $24 million paid at closing (the "Closing Payment") and up to $10 million of additional purchase price (the "Contingent Payment") payable contingent on the acquired company achieving certain performance metrics in 2017." Exhibit "C."

8

51.     The LOI included detailed terms for the Closing Payment and the Contingent Payment. It included the proportions of cash and restricted common stock that would comprise the Closing Payment and the Contingent Payment, it provided that the "valuation includes the value of retained management and other key employees," and it included other key financial terms. Exhibit "C."

52.     The LOI set forth the mutually agreed structure of the transaction. It provided: "Our proposal assumes the purchase by EPAM (or an acquisition vehicle formed by EPAM), of substantially all of the assets of the business of the Company;" "EPAM will pay the Closing Payment (net of adjustments and escrow) in a combination of 80% cash and 20% EPAM common stock;" "The seller will be eligible to receive the Contingent Payment, dependent on PointSource Revenue and EBITDA results for 2017 (or sooner as discussed further below)." The LOI articulated the specific "operating guidelines" that would be applied during 2017 to determine the Contingent Payment. Exhibit "C."

53.     The LOI anticipated a purchase agreement, "which will contain customary terms and conditions for a transaction of this size and nature, including representations, warranties, covenants, and indemnification provisions." Exhibit "C."

54.     The LOI gave every indication of EPAM's intention and the parties' mutual commitment to negotiate diligently and in good faith and to close the deal absent the discovery of unanticipated negative revelations in due diligence, failure of the conditions expressly stated in the LOI, or a good faith reason not to complete the anticipated transaction. Conversations with EPAM confirmed PointSource's understanding that EPAM intended and promised to negotiate in good faith to close the deal.

55.     The LOI indicated it had "the enthusiastic support of [EPAM's] senior management." The LOI further said that EPAM's Board of Directors was aware of the proposed acquisition, implying the Board shared the enthusiastic support of EPAM's senior management. The LOI was signed by Arkadiy Dobkin, EPAM's President and CEO and himself a member of the Board of Directors. Exhibit "C."

56.     The LOI specifically promised: "We do not foresee any issues that would prevent us from consummating a transaction at this stage." Exhibit "C."

57.     As set forth in the LOI, EPAM planned to undertake "a full due diligence" of PointSource "including but not limited to business, finance, legal, tax, human resources and employee benefits, IT systems and other areas." EPAM would provide PointSource with its due diligence lists and templates and, at the conclusion of due diligence, would determine a "definitive list of conditions to closing." Exhibit "C."

58.     The LOI included a list of conditions necessary to the closing of the transaction, including the receipt of all governmental and third-party approvals necessary to consummate the transaction.

59.     Financing was not a condition to closing. EPAM reported "sufficient cash resources necessary to consummate an acquisition" and stated that "[s]ecuring financing is not a condition precedent to consummating a transaction between EPAM and the Company." Exhibit "C."

60.     The LOI included a generic statement of "non-binding agreement." Exhibit "C."

61.     Notwithstanding the generic "non-binding" language, EPAM expressly promised in the LOI to "work diligently with our representatives and the Company's team and representatives to close the transaction in an expedient manner." Exhibit "C."

4824-9086-0154

**C.    EPAM Undertakes Comprehensive Due Diligence, Assures PointSource the Results are Positive, and Identified No Problems That Might Threaten Closing**

62.    Between January 2017 and April 2017, EPAM and PointSource made substantial efforts toward consummating the deal.

63.    In consideration of the terms set forth in the LOI and the parties' mutual intent to work toward a successful closing in the spring of 2017, PointSource worked diligently and cooperatively with EPAM in due diligence.

64.    On January 24, 2017, EPAM emailed PointSource to express its excitement about the forthcoming purchase, to obtain access to PointSource's dataroom, and to introduce PointSource to EPAM's point person for due diligence.

65.    As set forth in the LOI, EPAM estimated that due diligence would last approximately 12 weeks—until approximately mid-to-late April 2017.

66.    On January 28, 2017, EPAM provided PointSource with its due diligence request lists for financial, human resources, IT, and legal.

67.    On February 12, 2017, PointSource provided EPAM with access to the virtual dataroom and with documents and information pertaining to the financial and IT due diligence.

68.    On February 13, 2017, PointSource added documents and information relating to the human resources due diligence to the dataroom.

69.    On February 20, 2017, PointSource added documents and information relating to the legal due diligence to the dataroom.

70.    On February 22, 2017, EPAM introduced PointSource to its outside counsel.

71.    By the end of February 2017, EPAM had full access to PointSource's virtual dataroom, which contained all of the documents EPAM requested.

4824-9086-0154

72.     After the dataroom was fully uploaded, EPAM and PointSource held several telephone calls to discuss due diligence-related issues.

73.     In March 2017, EPAM requested access to the dataroom for its outside counsel so that counsel could review customer contracts, conduct legal due diligence, and review materials relating to PointSource's Belarus affiliate.

74.     EPAM issued several follow-up requests for additional information.  Each time, PointSource uploaded the requested information to the dataroom for EPAM's review.

75.     According to PointSource's data log, EPAM and/or its counsel accessed and reviewed all relevant documents in the dataroom.

76.     EPAM discovered no problems during due diligence and did not express concern to PointSource regarding any of the information shared by PointSource.

77.     EPAM did not indicate in any manner at any time any hesitation about purchasing PointSource or that it foresaw any issue that might compromise closing.

78.     To the contrary, at every possible opportunity, EPAM assured PointSource due diligence was progressing positively, there were no problems in the due diligence stream, PointSource's departments were highly organized, and EPAM anticipated a successful acquisition.

79.     EPAM promised it would have a draft purchase agreement to send to PointSource by mid-to-late March 2017 and anticipated closing would take place by the end of April 2017— within the approximately 12-week timeline stated in the LOI.

**D.     EPAM Sends PointSource a Draft Asset Purchase Agreement**

80.     On March 23, 2017, EPAM's external counsel sent PointSource a detailed draft Asset Purchase Agreement (the "Purchase Agreement").

4824-9086-0154

81.     Pursuant to the Purchase Agreement, PointSource would sell to an EPAM entity substantially all of PointSource's assets.

82.     The Purchase Agreement mirrored the material terms of the deal set forth in the LOI, including the $24 million Closing Payment.

83.     The Purchase Agreement also reflected EPAM's intention to acquire PointSource's affiliate in Belarus, which would be accomplished pursuant to a separate Belarus Asset Purchase Agreement.

**E.     EPAM and PointSource Have Several Successful Meetings, EPAM Instructs PointSource to Proceed as if the Deal is Done, and EPAM Begins Integration**

84.     EPAM and PointSource's leadership teams held in-person meetings on March 30, 2017 and April 3, 2017 at which EPAM continued to signal the transaction was complete.

85.     On March 30, 2017, key personnel from EPAM and PointSource met in Newtown, PA to discuss the timeline to closing, the Purchase Agreement, sales and project execution in 2017, the integration process, short-term project collaborations, and designations of the management team and key employees.

86.     On April 3, 2017, EPAM's human resources leadership team met PointSource in Raleigh to facilitate a smooth transition for employees and to continue work on the personnel integration plan.  At the meeting, they discussed collaboration on sales and delivery initiatives, EPAM's DEP taxonomy and levels to be applied against PointSource's workforce, and comparisons of employee titles between the two companies.

87.     EPAM and PointSource held a successful meeting in Belarus to discuss EPAM's acquisition of PointSource's Belarus affiliate.

13

88.     At these meetings, EPAM explicitly directed PointSource to treat the transaction as a done deal and instructed PointSource to prepare to tell clients and employees about the forthcoming acquisition.

89.     PointSource understood EPAM's assurances that it should treat the transaction as a done deal as unequivocal promises that EPAM planned to finalize the Purchase Agreement and take the remaining steps necessary to close and finalize the transaction.

90.     PointSource relied on EPAM's representations that the deal was "done."  With the knowledge, assistance, and approval of EPAM, PointSource began the process of integrating systems, employees, and strategic plans.  As part of the integration process, EPAM and PointSource discussed PointSource's projected sales and project execution in 2017, reviewed and modified PointSource's existing communications and messaging plans, collaborated to create efficiencies and streamlined operations, developed employee incentive constructs, reviewed employee handbooks, and defined the post-acquisition roles of key employees.  PointSource continued to build its business plan around EPAM's impending transaction and prepared employees for the acquisition.

91.     EPAM and PointSource discussed hiring new employees after closing.  They discussed the transition and progression of the personnel integration plan and considered employee-level mapping.  EPAM told PointSource that it was considering adopting many of PointSource's human resources materials, policies, and handbooks.

92.     In early April 2017, at EPAM's instruction, PointSource informed its key employees of the forthcoming acquisition.   PointSource held individual and group meetings with its key employees and prepared them to join EPAM's team and help in the integration process.  Echoing the enthusiasm for the deal expressed by EPAM and EPAM's assurance the deal would

be done quickly, PointSource told its key employees it was confident EPAM was uniquely qualified to partner with PointSource and that the acquisition would positively impact PointSource's continued growth.

93.     On April 4, 2017, EPAM provided PointSource with a timeline for finishing the transaction. The timeline outlined the few remaining critical path items, dates for integration planning, proposed signing dates, the consents required, and closing dates.

94.     EPAM's timeline provided that it would conclude financial due diligence by April 21, 2017, proposed a signing date of April 28, 2017 for the Purchase Agreement, and tentatively scheduled closing to take place in mid-May 2017.

95.     The timeline further provided that between April 4, 2017 and closing, EPAM would prepare ancillary transaction documents, provide an asset purchase agreement for purchase of Belarus affiliate, and obtain consents of customers, landlords, and other interested parties.

96.     On April 5, 2017, EPAM emailed PointSource to summarize the progress already made in the initial integration of EPAM and PointSource's employees and technologies. EPAM thanked PointSource for a successful meeting between the respective human resources leadership teams. EPAM also considered how it might measure a successful transaction a year after closing. This question, EPAM suggested, was important "so all are marching to same goals as well as being clear on where/how we want to focus on the synergy play in the market/with our clients."

97.     Through early April 2017, EPAM continued to introduce PointSource to EPAM employees engaged in the integration process and continually updated the list of critical path items remaining to be completed before closing.

15

98.     EPAM and PointSource scheduled a call to take place on April 12, 2017 and a meeting on April 18, 2017 to finalize due diligence and integrate the companies' go-to-market strategies.

99.     At no time during due diligence, contract negotiations, integration, or the other numerous steps the parties took to consummate the deal did EPAM disclose it might not complete the acquisition.

**F.      PointSource Returns the Purchase Agreement to EPAM**

100.    On April 4, 2017, PointSource sent EPAM its proposed edits to the Purchase Agreement.

101.    None of EPAM's proposed edits altered the material or financial terms of the transaction.

102.    The morning of April 5, 2017, EPAM's counsel told PointSource that it would respond shortly with any questions and comments it might have in response to PointSource's edits.

**G.      EPAM Proposes a Structural Change to the Asset Purchase Agreement**

103.    In the afternoon of April 5, 2017, EPAM told PointSource by email that it was working through PointSource's proposed edits to the Purchase Agreement and was "hoping to speak on it tomorrow and keep things moving."

104.    In the same April 5, 2017 email, EPAM proposed that the structure of the U.S. part of the transaction change from an asset purchase to an equity purchase.  EPAM expected PointSource would be "agnostic" to the change "[f]rom a financial perspective" because "the economics shouldn't change."  EPAM suggested the structural change "may be more appealing" to PointSource because EPAM would assume historical liabilities in an equity deal.  EPAM

16

informed PointSource that it specifically intended this change to streamline the process, simplify

the earnout accounting process, ensure integration was as easy as possible, and eliminate the

need to seek the consent of clients to assign their contracts as part of the transaction.

105.   EPAM informed PointSource that its President and CEO had already approved

the change and that, if PointSource agreed to EPAM's proposed change, it would promptly be

reflected in a new draft of the Purchase Agreement.

106.   EPAM and PointSource discussed the proposed structural change by phone.  On

the phone call, EPAM's President and CEO confirmed that the intent of the structural change

was to streamline and expedite the transaction so that it could close sooner rather than later.

107.   PointSource accepted EPAM's proposed structural change.

108.   On April 6, 2017, EPAM confirmed it would send PointSource a revised draft

Purchase Agreement reflecting an equity purchase for the U.S. part of the transaction in the first

half of the week of April 10, 2017.

**H.      EPAM Withdraws From Negotiations in Bad Faith and Without Reason**

109.   EPAM and PointSource worked actively, cooperatively, and diligently through

the first week and a half of April to complete the few remaining critical path items.

110.   The morning of April 11, 2017, PointSource emailed EPAM with a status update.

PointSource's email included an updated list of the tasks completed since the parties' April 3,

2017 meeting, a list of tasks currently in progress, and a short list of items that would be

completed shortly.  In the email, PointSource asked EPAM if it could coordinate "the weekly

checkpoint call we discussed as a way of ensuring we stay synched on progress?"

111.   Later that day, April 11, 2017, EPAM notified PointSource by phone it was

unilaterally and arbitrarily terminating its acquisition of PointSource.

112.     EPAM did not provide any reason for its unilateral, arbitrary termination of the transaction during the April 11, 2017 phone call or during subsequent communications.

113.     PointSource attempted to learn the reason(s) for EPAM's unilateral and arbitrary termination, but EPAM gave only contradictory and non-specific reasons, including the general statement that EPAM had changed its priorities.  EPAM's representatives specifically said the change of course was not motivated by any legal due diligence or other legal issues.

114.     EPAM's decision was unreasonable, sudden, and directly contrary to its prior promises and assurances.

**I.        PointSource Experienced No Adverse Change to its Business Operations**

115.     Between September 7, 2016—the date EPAM signed the Confidentiality Agreement—and April 11, 2017—the termination date—there were no adverse changes in PointSource's business.  PointSource's actual 2016 financials were in line with the estimates shared with EPAM.  Further, despite PointSource's allocation of resources to negotiations with EPAM and fulfilling EPAM's due diligence requests, PointSource continued to execute on the 2017 financial forecast given to EPAM and its revenue exceeded first-quarter estimates.  In fact, PointSource's client base grew during the time EPAM was conducting its due diligence.

**J.        EPAM Discloses Confidential Information to a Third Party in Violation of the Confidentiality Agreement and the LOI**

116.     The Confidentiality Agreement explicitly called for strict confidentiality.  It required EPAM "not to disclose to any third party: (a) the existence or contents of this Agreement; (b) the fact that the parties are evaluating the possibility of a transaction; or (c) the status of any such evaluation or possible transaction."  The Confidentiality Agreement further required that EPAM keep confidential: "The Information, the fact that information has been

18

provided, and the status of any discussions or negotiations that are or may be occurring regarding a potential transaction." Exhibit "B."

117.    The LOI also required strict adherence to confidentiality: "EPAM conveys this proposal with the understanding that its existence and contents are and will remain strictly confidential and will not be disclosed." Exhibit "C."

118.    In March 2017, PointSource learned one of EPAM's senior executives disclosed the impending acquisition to one of PointSource's former clients, in direct violation of the confidentiality protections in the Confidentiality Agreement and the LOI.

119.    EPAM disclosed material non-public information, including the status of the transaction.

120.    Disclosure of this confidential information threatened material adverse effects on PointSource's business, including employee attrition and damage to commercial relationships.

## COUNT I
### Breach of the Duty to Negotiate in Good Faith

121.    Plaintiff incorporates the above paragraphs as if set forth at length herein.

122.    In its dealings with PointSource, EPAM had a duty to negotiate in good faith and to work diligently to complete the transaction.

123.    As described above, EPAM executed an LOI with the specific intent to acquire PointSource. The LOI dictated the general structure of the transaction and set forth the material terms, including a detailed company valuation. The LOI provided EPAM and PointSource would enter into a purchase agreement, "which will contain customary terms and conditions for a transaction of this size and nature, including representations, warranties, covenants, and indemnification provisions;" that EPAM did "not foresee any issues that would prevent us from

consummating a transaction;" and that the transaction had the support of EPAM's Board of Directors and senior management.

124.    EPAM expressly and in writing promised to "work diligently . . . to close the transaction in an expedient manner." The LOI gave every indication EPAM intended to negotiate diligently and in good faith to close the deal absent the discovery of unanticipated negative revelations in due diligence, failure of the conditions expressly stated in the LOI, or a good faith reason not to complete the anticipated transaction.

125.    In conversations before and after execution of the LOI, EPAM and PointSource expressly and mutually agreed to negotiate diligently and in good faith and close the deal in an expedient manner.

126.    PointSource's agreement to the terms in the LOI was valuable to EPAM, and by accepting the terms in the LOI, PointSource conferred a bargained-for benefit on EPAM, which was valid consideration for EPAM's promise to negotiate in good faith.

127.    After agreeing to the terms in the LOI, the companies worked extensively in due diligence, held numerous positive meetings, exchanged deal documents, and began the process of integrating the two companies. EPAM did not identify any impediment to closing. Instead, it explicitly encouraged PointSource to operate as if the deal would close as scheduled.

128.    EPAM breached its duty and its promise to negotiate diligently and in good faith by suddenly and unexpectedly terminating its acquisition of PointSource after months of due diligence and its repeated assurances the deal was done.

129.    EPAM breached its duty and its promise to negotiate diligently and in good faith by assuring PointSource it did "not foresee any issues that would prevent us from consummating

a transaction," and identifying no subsequent issues, but nonetheless suddenly and unexpectedly withdrawing from the transaction without a good faith reason.

130.    EPAM breached its duty and its promise to negotiate diligently and in good faith by failing to adhere to its assurance in the LOI it would "work diligently with our representatives and the Company's team and representatives to close the transaction in an expedient manner."

131.    EPAM breached its duty and its promise to negotiate diligently and in good faith by misleading PointSource as to EPAM's intentions.

132.    EPAM breached its duty and its promise to negotiate diligently and in good faith terminating the deal without providing PointSource a specific, valid, and good faith reason for abruptly, unexpectedly, and arbitrarily doing so.

133.    But for EPAM's bad faith termination of negotiations, the parties would have reached a final agreement and closed the transaction.

134.    As a result of EPAM's breach of its express promise to negotiate diligently and in good faith, PointSource was forced to find a less beneficial deal from another buyer.  EPAM's last-minute, bad faith withdrawal from negotiations caused PointSource to suffer damages in excess of $8.5 million.

135.    As a result of EPAM's breach of its promise to negotiate diligently and in good faith, PointSource suffered damages in the nature of out-of-pocket business and legal costs. PointSource expended significant time and resources during the due diligence process to comply thoroughly with all of EPAM's requests.  PointSource suffered significant business disruption because it was forced to change paths after EPAM's sudden and unexpected withdrawal.

136.    As a result of EPAM's breach of its promise to negotiate diligently and in good faith, PointSource suffered material reputational harm.

21

137.    EPAM's conduct and its breach of its promise to negotiate diligently and in good faith were done intentionally, recklessly, and/or with wanton disregard to the rights of and potential consequences to PointSource.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment against Defendant EPAM Systems, Inc. and award compensatory damages, including reliance and expectation damages, in an amount in excess of $75,000.00, together with interest, cost and attorneys' fees, punitive damages, and such further relief as this Court deems just and proper.

### COUNT II
### Promissory Estoppel

138.    Plaintiff incorporates the above paragraphs as if set forth at length herein.

139.    EPAM made promises—including its promise to negotiate diligently and in good faith a deal that reflected the terms set forth in the LOI and its promise that PointSource should treat the deal as done—that it should have reasonably expected would induce action and forbearance by PointSource.

140.    In reliance on EPAM's promises that it intended to enter into a purchase agreement with PointSource, that it saw no issues that would prevent completion of the transaction, that the transaction had the support of EPAM's management and Board of Directors, that EPAM would work diligently to close the transaction in an expedient manner, and assurances from EPAM's President and CEO that EPAM was fully committed to completing the deal described in EPAM's proposal, PointSource agreed to negotiate with EPAM, committed to negotiate exclusively with EPAM, rejected purchase offers from other companies, and devoted substantial time, effort, and resources to the due diligence and contracting processes with EPAM.

141.    EPAM knew that PointSource committed to exclusivity in negotiations with EPAM.  With that knowledge, EPAM actively pursued due diligence, held numerous meetings,

22

assured PointSource closing would take place, prepared closing documents, and took numerous other steps to reinforce PointSource's impression a successful closing was imminent.

142.     In reliance on EPAM's repeated instruction that PointSource should treat the deal as done and promises the deal would close, PointSource followed EPAM's instruction and prepared to tell clients and employees about the forthcoming acquisition.  PointSource held individual and group meetings with its key employees and prepared them to join EPAM's team. PointSource actively integrated its systems into EPAM's systems, including developing personnel integration plans and employee mapping.

143.     In reliance on EPAM's promise that EPAM's proposal to change the structure of the transaction from an asset purchase to an equity purchase was intended to expedite closing and streamline the process, PointSource agreed to EPAM's proposal to change the structure of the transaction.  EPAM's statements and actions constituted unambiguous promises that it intended to make final the Purchase Agreement in accordance with the terms discussed and agreed to by PointSource.

144.     In reliance on EPAM's repeated assurances the transaction would close in April or May 2017, and its actions to expedite closing and ensure seamless integration of the parties' businesses, PointSource structured its business plan to be based on the anticipated acquisition.

145.     PointSource's reliance on each of these promises by EPAM was reasonable.

146.     Injustice can be avoided only by enforcing EPAM's promises.

147.     PointSource sustained injuries by relying on EPAM's promises.

148.     As a result of EPAM's representations and unfulfilled promises, PointSource rejected purchase offers from other companies.

149.    As a result of EPAM's representations and unfulfilled promises, PointSource was forced to find a less beneficial deal from another buyer.

150.    As a result of EPAM's representations and unfulfilled promises, PointSource suffered damages in excess of $8.5 million.

151.    As a result of EPAM's representations and unfulfilled promises, PointSource suffered damages in the nature of out-of-pocket business and legal costs. PointSource expended significant time and resources during the due diligence process to comply thoroughly with all of EPAM's requests. PointSource suffered significant business disruption because it was forced to change paths after EPAM's sudden and unexpected withdrawal.

152.    As a result of EPAM's representations and unfulfilled promises, PointSource suffered material reputational harm.

153.    EPAM's conduct and its failure to adhere to its promises were done intentionally, recklessly, and/or with wanton disregard to the rights of and potential consequences to PointSource.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment against Defendant EPAM Systems, Inc. and award compensatory damages, including reliance and expectation damages, in an amount in excess of $75,000.00, together with interest, cost and attorneys' fees, punitive damages, and such further relief as this Court deems just and proper.

## COUNT III
## Breach of Contract

154.    Plaintiff incorporates the above paragraphs as if set forth at length herein.

155.    The Confidentiality Agreement and the LOI contained agreements by EPAM to keep confidential certain non-public, confidential, or propriety information exchanged between

24

PointSource and EPAM and well as information related to negotiations between PointSource and EPAM.

156.    The Confidentiality Agreement required EPAM "not to disclose to any third party: (a) the existence or contents of this Agreement; (b) the fact that the parties are evaluating the possibility of a transaction; or (c) the status of any such evaluation or possible transaction." The Confidentiality Agreement further required that EPAM keep confidential: "The Information, the fact that information has been provided, and the status of any discussions or negotiations that are or may be occurring regarding a potential transaction."  Exhibit "B."

157.    The LOI provided: "EPAM conveys this proposal with the understanding that its existence and contents are and will remain strictly confidential and will not be disclosed." Exhibit "C."

158.    EPAM breached the Confidentiality Agreement and the LOI by failing to comply with the confidentiality requirements and disclosing EPAM's impending acquisition of PointSource to an independent third party.

159.    EPAM's disclosure included the disclosure of material non-public information, including disclosure of the status of the transaction.

160.    Disclosure of this confidential information threatened profound adverse effects on PointSource's business, including employee attrition and damage to relationships with commercial counterparties.

161.    As a result of EPAM's breach as set forth above, PointSource suffered material financial and reputational harm.

162.    EPAM's disclosure of confidential information was done, recklessly, and/or with wanton disregard to the rights of and potential consequences to PointSource.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment against Defendant EPAM Systems, Inc. and award consequential damages in an amount in excess of $75,000.00, together with interest, cost and attorneys' fees, punitive damages, and such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims for relief that may be tried before a jury.

Respectfully submitted,

Mathieu J. Shapiro (76266)
Rigel C. Farr (316869)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
215.665.3000 (p)
215.665.3165 (f)
*Attorneys for Plaintiff*

Dated: November 9, 2018

4824-9086-0154

# Exhibit "A"

## ASSIGNMENT OF CHOSE IN ACTION

In exchange for value received, Pointsource, LLC, a Florida limited liability company, as assignor, assigns to CKSJB Holdings, LLC, a Florida limited liability company, as assignee, and assignee's legal representatives and assigns, for its and their use and benefit all claims, demands and cause of action of whatsoever kind and nature that Pointsource, LLC have had, now had or may have against EPAM Systems, Inc..

This assignment is without recourse. Assignor represents and warrants it has the lawful right and authority to make this Assignment of chose in action

Dated this 23 day of ___May___, 2017

POINTSOURCE, LLC

By: _____

Printed Name: Christopher Hugill

Its: Manager


SWORN TO AND SUBSCRIBED before me this 23rd day of ___May___ 2017 by Christopher Hugill, as Manager of Pointsource, LLC, who is personally known to me or who has produced _____ as identification. If no type of identification is indicated, the above-named person is personally known to me.

_____

Signature of Notary Public

MARIA L. MAGUIRE

Print Name of Notary Public

(Notary Seal)


MARIA L. MAGUIRE
Commission # FF 021177
Expires June 4, 2017
Bonded Thru Troy Fain Insurance 800-385-7019

I am a Notary Public of the State of ___FLORIDA___ and my commission expires on ___June 4, 2017___.

4168155.v1

# Exhibit "B"



# MUTUAL CONFIDENTIALITY AGREEMENT

Company Name:     PointSource, LLC (the "**Company**")
Address:          Attn: Contract Governance
                  PO Box 10488
                  Bradenton, FL 34282

THIS MUTUAL CONFIDENTIALITY AGREEMENT (this "**Agreement**"), made this 7th day of September, 2016, by and between EPAM Systems, Inc. ("**EPAM**") and the Company.

This Agreement will set forth our understanding regarding the restrictions that are to be placed on the use, dissemination and disclosure of certain non-public, confidential or proprietary information to be exchanged (whether in writing or orally) between EPAM and the Company. This information may include, but will not necessarily be limited to, each of our companies' respective proprietary information regarding current and future products and services, together with analyses, compilations, studies or other documents prepared by the recipient or its employees, agents, advisors or representatives (collectively, "**Representatives**") and is hereinafter referred to as the "Information".

Each party hereby confirms its respective interest in examining the Information for the purpose of evaluating the possibility of a transaction between the parties and in consideration of the furnishing by each other of the Information, each party agrees that:

1.  The information shall not be used for any purpose or be distributed or disclosed by the recipient or its Representatives, other than in connection with its evaluation of the transaction between the parties, without the prior written consent of the disclosing party. Each party agrees not to disclose to any third party: (a) the existence or contents of this Agreement; (b) the fact that the parties are evaluating the possibility of a transaction; or (c) the status of any such evaluation or possible transaction. The Information, the fact that information has been provided, and the status of any discussions or negotiations that are or may be occurring regarding a potential transaction will be kept confidential and subject to the terms of this Agreement by each recipient and its Representatives for three years from the date of disclosure or such longer period required by law. Each party shall exercise due diligence to maintain all Information in confidence; "due diligence" shall mean at least the same precautions and standard of care which a reasonable person in such business would use to safeguard its own proprietary information.

2.  Each party agrees to transmit the Information only to its Representatives who need to know the Information for the purposes set forth herein and are made aware of the terms and conditions of this Agreement. In any event, each party shall be responsible for any breach of this Agreement by its Representatives.

3.  The term "Information" does not include information that (a) is or becomes generally available to the public other than as a result of disclosure by the recipient or anyone to whom the recipient transmits the information, (b) becomes available to the recipient on a non-confidential basis from a source other than the disclosing party who is not bound by a confidentiality agreement with the disclosing party, (c) was known to the recipient or in its possession prior to the date of disclosure by the disclosing party, (d) is furnished by the disclosing party to others with written permission to disclose, or (e) is independently developed by the recipient without reference to the Information.

4. Company acknowledges and agrees that to the extent Information of EPAM includes material non-public information, Company and its Representatives shall not trade in EPAM securities in violation of, and Company and its Representatives shall comply with, all securities laws and regulations including insider trading laws.

5. The receiving party understands that neither the disclosing party nor any of its Representatives has made or makes any representation or warranty as to the accuracy or completeness of the Information. As the receiving party, each party agrees that neither the disclosing party nor its Representatives shall have any liability to the receiving party or any of its Representatives resulting from the use of the Information, except as may be provided in a definitive agreement.

6. Upon the disclosing party's written request, except as required for archival or compliance purposes, (i) the Information, other than that portion of the Information which consists of analyses, compilations, studies or other documents prepared by the recipient or its Representatives, will be returned to the disclosing party immediately upon the disclosing party's request (or at the recipient's option, be destroyed by the recipient) and (ii) that portion of the Information which consists of analyses, compilations, studies or other documents prepared by the recipient or its Representatives, will be held by it and kept confidential and subject to the terms of this Agreement (or at the recipient's option, be destroyed by the recipient).

7. If the recipient or anyone to whom it transmits the Information is required to disclose any Information, by law, regulation or legal or regulatory process, the recipient will provide the disclosing party with prompt notice so that the disclosing party may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, the recipient will furnish only that portion of the Information which is legally required and will exercise its best efforts, at the expense of the disclosing party, to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Information.

8. Each party agrees that, in the event of any breach of this Agreement by either of them, or its Representatives, the other would be irreparably and immediately harmed and could not be made whole by monetary damages. Without prejudice to any rights and remedies otherwise available, such other party shall be entitled to equitable relief by way of injunction in the event of a breach of any provision of this Agreement.

9. The recipient shall have no obligation to enter into any further agreement with the other party, conduct or continue discussions or negotiations, or enter into or negotiate a definitive agreement. Each party agrees that no contract or agreement providing for a transaction shall exist until definitive agreements have been executed and delivered by duly authorized representatives of each party. Each party reserves the right, in its sole discretion, to reject any and all proposals with regard to any proposed transaction or relationship or any definitive agreement and to suspend or terminate discussions and negotiations at any time. For purposes of this paragraph, definitive agreements do not include an executed letter of intent or any other preliminary written document that the parties state is not intended to be legally binding, or any oral agreement or course of conduct. It is understood that no patent, copyright, trademark or other proprietary right or license is granted by this Agreement.

10. Each party shall bear its own costs in connection with the negotiation, preparation, execution and performance of this Agreement and the consideration or evaluation of the Information and any proposed transaction.

11. Each party recognizes that the other (including certain of its corporate affiliates) may be engaged in the research, development, production, marketing, licensing and/or sale of similar services or products to those being considered under this Agreement. Such services or products may be competitive with those of the other and may display the same or similar functionality. Nothing in

this Agreement shall be construed to prevent either party from engaging independently in such activities, provided it does not utilize the Information of the other in order to do so.

12. This Agreement will be governed by and construed under, the laws of the State of Delaware, without regard to the principles of choice of law.

13. This Agreement represents the entire understanding and agreement of the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may not be modified or amended, except by a written instrument duly executed by both parties. This Agreement may not be assigned by either party.

14. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions of this Agreement, which shall remain in full force and effect. If any of the provisions of this Agreement shall be deemed to be unenforceable by reason of its extent, duration, scope or otherwise, then the parties contemplate that the court making such determination shall enforce the remaining provisions of this Agreement, and shall reduce such extent, duration, scope, or other provision and shall enforce them in their reduced form for all purposes contemplated by this Agreement.

15. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the date first written above.

EPAM SYSTEMS, INC.

Name:   Arkadiy Dobkin
Title:    President & CEO

COMPANY

Name:   Kevin S. Hugill
Title:    CFO

# Exhibit "C"



STRICTLY PRIVATE AND CONFIDENTIAL

January 19, 2017

PointSource LLC
c/o Merger Tech Advisors
Attention: Rohit Malhotra

     Re: PointSource

Dear Mr. Malhotra:

EPAM Systems, Inc. ("EPAM") is pleased to provide this non-binding indication of interest to acquire substantially all of the assets of PointSource LLC (together with any subsidiaries, "PointSource" or the "Company") under the terms set forth in this letter.  Based on an initial review of the Company, we believe PointSource would be a valuable addition to the EPAM group of companies.

## STRATEGIC INTEREST

PointSource's focus on digital transformation, strategically located Research Triangle headquarters, solid customer relationships and its highly skilled and experienced personnel are all factors that we believe provide an opportunity to expand EPAM's current service offerings and accelerate our progress toward achieving strategic objectives.

PointSource will complement and extend EPAM's Digital Engagement and our offerings to clients in the insurance industry.  We view these areas as important parts of EPAM's strategy and success.  We believe that the Company's personnel will integrate easily with our existing teams in the U.S. and Belarus, due to our complementary cultures and areas of expertise.  Moreover, we believe the combined products and services of EPAM and PointSource will allow deeper penetration into our respective client bases, as well as an enhanced offering for potential new customers.

## VALUATION AND ASSUMPTIONS

Our proposed valuation of the Company is between $24 million and $34 million.  We have based this proposed valuation solely on limited information provided by the Company and it is subject to EPAM's full due diligence review of the Company (including introductions to and discussions with such Company personnel as EPAM deems appropriate).  EPAM would pay the purchase price in two tranches, with $24 million paid at closing (the "Closing Payment") and up to $10 million of additional purchase price (the "Contingent Payment") payable contingent on the acquired company achieving certain performance metrics in 2017.  The Closing Payment will be made in a combination of 80% cash and 20% restricted common stock (vesting in equal portions on the first, second and third anniversaries of closing), and the Contingent Payment will be made in a combination of 60% cash and 40% restricted common stock (vesting in equal portions on the second and third anniversaries of closing). The valuation includes the

EPAM
41 University Drive, Suite 202, Newtown, PA 18940 USA  |  P: +1 267 759 9000

value of retained management and other key employees and, as a result, a portion of the overall consideration tied to continued employment (e.g. the restricted stock component) may be classified as ordinary income/compensation to the sellers for tax purposes, or otherwise tax at higher or different rates. EPAM will require that between $500,000 and $750,000 (comprised of cash and restricted stock) of the Closing Payment and up to 20% (comprised of cash and restricted stock - ratio of cash to restricted stock to be determined in due diligence) of the Contingent Payment be allocated to key personnel (specific individuals to be determined in due diligence) to incentivize retention, achievement of the performance targets on which the Contingent Payment is based and further long-term success with EPAM.

We are assuming that the Company will be free of debt at closing (or debt would be repaid before or simultaneous with the closing), and would have sufficient working capital to carry on normal business operations thereafter. We would assume that cash-on-hand at closing will be purchased by us at closing, subject to sufficient diligence to confirm the amount of cash necessary to carry on normal business operations after closing. The purchase price will be adjusted upward or downward for actual closing working capital at closing.

In addition, EPAM would require 15% percent of the purchase price, consisting of all restricted EPAM common stock, to be held in escrow for a period of 15 months as a source of funds to cover indemnification obligations of the sellers under the terms of the definitive purchase agreement (the "Purchase Agreement"), further described below.

TRANSACTION STRUCTURE

Our proposal assumes the purchase by EPAM (or an acquisition vehicle formed by EPAM), of substantially all of the assets of the business of the Company. EPAM will determine whether the assets of PointSource's Belarus subsidiary or affiliate are to be included in the transaction, and will work with PointSource to structure the transaction appropriately.

EPAM will pay the Closing Payment (net of adjustments and escrow) in a combination of 80% cash and 20% EPAM common stock. The EPAM common stock portion will be restricted stock that vests in equal portions on the first, second and third anniversaries of closing and the unvested portion will be subject to forfeiture in circumstances described below under "Management and Employees."

The seller will be eligible to receive the Contingent Payment, dependent on PointSource Revenue and EBITDA results for 2017 (or sooner as discussed further below). The Contingent Payment will be paid in a combination of 60% cash and 40% restricted EPAM common stock (vesting in equal portions on the second and third anniversaries of the closing), based on the following scale:

| 2017 PointSource Revenue | 2017 EBITDA* | Contingent Payment Amount |
| --- | --- | --- |
| <$22 million | <20%* | No payment |
| ≥ $22 million | At least 20%* | $1 million |
| ≥ $23 million | At least 20%* | $3 million |
| ≥ $24 million | At least 20%* | $7 million |

| ≥ $25 million | At least 20%* | $10 million (it being understood that $10 million is the maximum Contingent Payment Amount) |
|---|---|---|

* Each 0.10% of 2017 EBITDA below 20% will decrease the Contingent Payment (determined by Revenue only) by 1.0%. For example, if revenue = $24 million and EBITDA = 18%, Contingent Payment = ($7 million * 80%) = $5.6 million

The following operating guidelines will be applied during 2017 (to determine the PointSource Revenue and EBITDA referenced above):

- PointSource will operate as a standalone unit of EPAM under EPAM's brand, with a separate P&L to account for "PointSource Revenue."

- PointSource Revenue will include revenue from:

    o PointSource existing accounts;

    o Named new accounts which will be identified and agreed with EPAM prior to closing;

    o Accounts assigned by EPAM to PointSource during 2017; and

    o Existing EPAM accounts on which PointSource existing personnel will be billable (with PointSource management to decide about final assignment).

- PointSource will be able to utilize EPAM resources based on pre-agreed cross-charging rules.

- EPAM will have the right to accelerate payment of the Contingent Payment by committing to the seller $8 million as full satisfaction of the Contingent Payment obligations during the period from following the closing until the earlier to occur of the date that is six months following closing or, September 30, 2017, in order to accelerate integration and alignment of the PointSource team with EPAM's personnel and strategic goals.

EPAM, as the purchaser, PointSource, as the seller, and certain key principals of PointSource will enter into the Purchase Agreement, which will contain customary terms and conditions for a transaction of this size and nature, including representations, warranties, covenants and indemnification provisions.

CONDITIONS TO CLOSING

This non-binding preliminary proposal has the enthusiastic support of our senior management, and our Board of Directors is aware of this potential opportunity. We do not foresee any issues that would prevent us from consummating a transaction at this stage. We will undergo a full due diligence of the Company, including but not limited to business, finance, legal, tax, human resources and employee benefits, IT systems and other areas. We will provide separately standard due diligence request lists and templates for completion by you, requesting customary information for transactions of this type. A definitive list of conditions to closing will be determined at the conclusion of our due diligence review.

In addition to satisfactory completion of due diligence, the closing of the transaction contemplated by this proposal is conditioned on the receipt of all governmental, third party and other approvals and consents necessary to consummate the transaction (including without limitation, consents of counterparties to material contracts to the extent required in a change of control by the terms of the contracts).

The definitive Purchase Agreement and the transaction will require approval by EPAM's Board of Directors.  No approval of our stockholders will be necessary for the consummation of the proposed transaction.

FINANCING

EPAM has sufficient cash resources necessary to consummate an acquisition of the Company, and anticipates paying the cash portion of the purchase price from our existing cash balances. Securing financing is not a condition precedent to consummating a transaction between EPAM and the Company.  EPAM's financial statements and other relevant information are available in our public filings with the U.S. Securities & Exchange Commission at www.sec.gov and on our website at www.epam.com.

MANAGEMENT AND EMPLOYEES

We believe that both the management team and overall employee base of the Company offer significant value to EPAM and stand to benefit from joining the EPAM team.  We anticipate continuing the employment of substantially all existing employees (subject to due diligence and our introduction to Company personnel, and absent any human resources, performance or similar issues now existing or hereafter identified).  We will seek to harmonize the Company's employee benefits to EPAM's current programs promptly following the closing of the transaction.

EPAM views the employees of our acquisition partners as critical to continuing success of the combined business and to preserving the value of EPAM's proposed investment.  Therefore, for any sellers or principals who receive EPAM common stock as consideration for the transaction (whether as a seller or as key personnel to which consideration is allocated), and who continue employment with EPAM after the closing of the transaction, if such person's employment with EPAM terminates at any time prior to the third anniversary of the closing, the unvested portion of his or her common stock will forfeit to EPAM.  Specific retention parameters for the other key employees of the Company will be determined during due diligence and negotiations between the parties.

Company management and other personnel may be eligible to participate in EPAM's annual performance bonus program as it may be in effect from time to time.  EPAM's current bonus program is discretionary and may be based in part on overall EPAM performance and individual contributions.  Any bonus payment is determined in EPAM's discretion and is subject to approval by EPAM's CEO.  Certain Company management and other personnel may also be eligible to receive equity awards under the terms of the EPAM Systems, Inc. 2015 Long Term Incentive Plan the time of EPAM's annual grants to other employees.  As with cash bonuses, awards under the LTIP are at the discretion of EPAM's Board of Directors and CEO. EPAM reserves the right to modify its compensation and benefit plans at any time in its sole discretion. After the closing of the acquisition or at any other time, the selling shareholders and other personnel of the Company may be subject to "blackout periods" based on U.S.

securities laws and EPAM's internal policies, which restrict trading by certain EPAM employees and others at various times.

Part of our due diligence review of PointSource will include an evaluation of which employees, if any, will be required to enter into new employment contracts with EPAM as a condition to closing. In general, except where required by law, EPAM does not enter into individual employment agreements. EPAM will require that the principals of the Company agree to non-competition and non-solicitation covenants appropriate to protect the goodwill of the Company and the value of EPAM's investment. Moreover, each such person will be required to comply with confidentiality covenants.

Upon the closing of the transaction, EPAM will require that each PointSource employee who remains with us following the acquisition certifies an acknowledgment of the EPAM Systems, Inc. Code of Conduct, and that appropriate documentation addressing confidentiality, ownership of intellectual property, and other employee covenants are in place.

TIMING

We are prepared to move forward to perform our due diligence review and prepare definitive documentation, which we expect can be completed in approximately 12 weeks. Given the significant commitment of time, expense and focus required by EPAM, our senior executives and external advisers, as we move forward, we may require a commitment of exclusivity by the Company and the sellers through the date of execution of the Purchase Agreement.

We would suggest that the relevant stakeholders from EPAM, the Company and their advisors participate in weekly calls in which we would discuss open items and progress. We would work diligently with our representatives and the Company's team and representatives to close the transaction in an expedient manner.

CONFIDENTIALITY

EPAM conveys this proposal with the understanding that its existence and contents are and will remain strictly confidential and will not be disclosed. In addition, the Company reaffirms its understanding that EPAM Systems, Inc. is a publicly traded company and Company and its representatives agree that to the extent information of EPAM includes material non-public information, the Company, its shareholders and its/their respective representatives (for whom the Company is be responsible) will not trade in EPAM securities in violation of all laws and regulations including U.S. insider trading laws.

NON-BINDING AGREEMENT

This proposal does not constitute and will not give rise to any legally binding obligation whatsoever on the part of EPAM. Moreover, except as expressly provided in any binding written agreement that EPAM and the Company may enter into in the future, no past, present or future action, course of conduct, or failure to act relating to the transaction described herein and/or this proposal or relating to the negotiation of the terms of the transaction contemplated herein and/or this proposal will give rise to or serve as the basis for any obligation or other liability on the part of such entities or any of their respective affiliates.

EPAM
41 University Drive, Suite 202, Newtown, PA 18940 USA  |  P: +1 267 759 9000

## CONTACTS

Viktar Dvorkin and Kevin Labick will manage this transaction, with support from others at EPAM and our advisors.  The primary details of the EPAM transaction team are listed below. We will provide the contact details of our advisors once we agree in principle to the terms of our proposal.

| | | | |
|---|---|---|---|
| Arkadiy Dobkin | President & CEO | 215 275 5640 | Arkadiy_dobkin@epam.com |
| Viktar Dvorkin | SVP, Co-Head Global Delivery | Office: 267-759-9000 x 56606 | Viktar_dvorkin@epam.com |
| | | Mobile: 609 240 1188 | |
| Kevin Labick | VP, Co-Head Digital Engagement | 215-565-5438 | Kevin_Labick@epam.com |
| Anthony Conte | SVP & CFO | 267-759-9000 x 59418 | Anthony_conte@epam.com |
| Ginger Mosier | SVP & General Counsel | 267-759-9000 x 56612 | Ginger_mosier@epam.com |
| Kate Pytlewski | Deputy General Counsel | 267-759-9000 x 48156 | kate_pytlewski@epam.com |

This proposal does not constitute and will not give rise to any legally binding obligation whatsoever on the part of EPAM.  Moreover, except as expressly provided in any binding written agreement that EPAM and the Company may enter into in the future, no past, present or future action, course of conduct, or failure to act relating to the transaction described herein and/or this proposal or relating to the negotiation of the terms of the transaction contemplated herein and/or this proposal will give rise to or serve as the basis for any obligation or other liability on the part of such entities or any of their respective affiliates.

CONCLUSION

We believe that a combination between EPAM and the Company presents a realizable opportunity to deliver value creation to the Company's customers, employees, and stockholders.  We are enthusiastic about this potential transaction and delivering this proposal to you, and remain committed to this opportunity.  We look forward to working with the Company toward the expeditious completion of a proposed transaction.

The management of EPAM would be pleased to discuss this further with you and we look forward to pursuing with you what we believe will be a very rewarding opportunity.

Very truly yours,

EPAM SYSTEMS, INC.

Arkadiy Dobkin
President and Chief Executive Officer

4031788.v1

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2018, I filed the foregoing Amended Complaint with the Clerk of Court and served copies upon Defendant's attorneys by electronic and first class mail:

Joshua M. Peles, Esquire
Attorney I.D. No. 16693-2015
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103-7301
(215) 851-8100

Michael S. Leib, Esquire
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606-7507
MLeib@ReedSmith.com
312-207-3928

*Attorneys for Defendant*


Mathieu J. Shapiro (76266)
Rigel C. Farr (316869)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
215.665.3000 (p)
215.665.3165 (f)
*Attorneys for Plaintiff*

4824-9086-0154