IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CKSJB HOLDINGS, LLC, successor in interest to POINTSOURCE, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>EPAM SYSTEMS, INC.,<br><br>*Defendant.* | CIVIL ACTION<br>NO. 18-2173 |

**PAPPERT, J.**                                                                                                                                              March 29, 2019

**MEMORANDUM**

      CKSJB Holdings, LLC sued EPAM Systems, Inc. for breach of the duty to negotiate in good faith, promissory estoppel and breach of contract. The claims arise from acquisition negotiations and a confidentiality agreement between EPAM and PointSource, LLC, to which CKSJB alleges it is successor in interest. EPAM moves to dismiss all claims for lack of standing and failure to state a claim upon which relief can be granted. The Court grants the Motion, though CKSJB may amend its breach of contract claim.

I

      In 2016, PointSource, a tech firm, was looking for a buyer that could "infuse cash and help the company grow its business." (Am. Compl. ¶ 17.) Several companies showed "substantial interest" in purchasing PointSource, including software development company EPAM. (*Id.* at ¶¶ 18–19.) On September 7, 2016, EPAM and PointSource signed a Confidentiality Agreement in which they, among other things, agreed not to disclose to any third party that EPAM was evaluating the possibility of a

1

transaction. (*Id*. at ¶¶ 20–23; Am. Compl. Ex. B ("Agreement") 1.) The Agreement also made clear that neither party was committing to a transaction, or even to continued negotiations, and that neither any written document that is not intended to be legally binding nor any oral agreement or course of conduct would constitute a "definitive agreement":

> The recipient shall have no obligation to enter into any further agreement with the other party, conduct or continue discussions or negotiations, or enter into or negotiate a definitive agreement. Each party agrees that no contract or agreement providing for a transaction shall exist until definitive agreements have been executed and delivered by duly authorized representatives of each party. Each party reserves the right, in its sole discretion, to reject any and all proposals with regard to any proposed transaction or relationship or any definitive agreement and to suspend or terminate discussions and negotiations at any time. For purposes of this paragraph, definitive agreements do not include an executed letter of intent or any other preliminary written document that the parties state is not intended to be legally binding, or any oral agreement or course of conduct.

(Agreement ¶ 9.) After executing the Confidentiality Agreement, EPAM began assessing PointSource's value. (Am. Compl. ¶ 24.) PointSource provided financial information and other documents to EPAM, and senior management for both parties arranged phone discussions and in-person meetings. (*Id*. at ¶¶ 26–29.)

On December 29, 2016, EPAM emailed PointSource its proposed price terms, which it specified were "not binding at this point." (*Id*. at ¶ 33.) On January 10, EPAM sent PointSource a draft Indication of Interest ("IOI"). (*Id*. at ¶ 34.) The IOI states that EPAM's proposal "assumes the purchase by EPAM (or an acquisition vehicle formed by EPAM), of substantially all of the assets of the business of [PointSource]." (Am. Compl. Ex. C ("IOI") 2.) It includes EPAM's proposed valuation of PointSource, "between $24 million and $34 million," and outlines a proposed transaction structure: "EPAM would pay the purchase price in two tranches, with $24 million paid at closing

2

. . . and up to $10 million of additional purchase price . . . payable contingent on the acquired company achieving certain performance metrics in 2017." (IOI 1.) The IOI also contained the following provision, which appeared twice, on two separate pages:

> NON-BINDING AGREEMENT
>
> This proposal does not constitute and will not give rise to any legally binding obligation whatsoever on the part of EPAM. Moeover, except as expressly provided in any binding written agreement that EPAM and [PointSource] may enter into in the future, no past, present or future action, course of conduct, or failure to act relating to the transaction described herein and/or this proposal or relating to the negotiation of the terms of the transaction contemplated herein and/or this proposal will give rise to or serve as the basis for any obligation or other liability on the part of such entities or any of their respective affiliates.

(IOI 5, 6.)

After receiving the draft IOI, PointSource called EPAM President and CEO Arkadiy Dobkin "to inquire about EPAM's intention to negotiate in good faith and to acquire PointSource pursuant to the terms in its letter of intent."[1] (Am. Compl. ¶ 35.) CKSJB alleges that Dobkin "assured PointSource that EPAM was fully committed to the transaction and, to induce PointSource to choose to move forward with EPAM, expressly agreed with PointSource to work diligently and to negotiate in good faith to complete the deal described in EPAM's proposal." (*Id.* at ¶ 36.) PointSource also asked EPAM to "adjust the carve-outs and allocations to PointSource's key personnel." (*Id.* at ¶ 37.) On January 15, PointSource sent EPAM a redlined version of the draft IOI. (*Id.* at ¶ 38.) EPAM agreed to PointSource's proposed changes. (*Id.* at ¶ 37.) EPAM executed the final IOI on January 19, 2017. (*Id.* at ¶¶ 37–39; IOI 1.)

---

[1] CKSJB and PointSource refer to the IOI as a "Letter of Intent."

3

CKSJB alleges that PointSource "agree[d] to" and "accept[ed]" the IOI's terms. (Am. Compl. ¶¶ 126–27.) The Amended Complaint states that "the executed [IOI] established a framework for the parties' continued negotiations and reflected the material terms of the proposed acquisition, as agreed to by EPAM and PointSource." (*Id.* at ¶ 47.) "The parties intended the [IOI] both to continue and to re-establish their mutually binding agreement to negotiate diligently and in good faith." (*Id.* at ¶ 48.)

On January 19, the day PointSource received the final IOI, PointSource emailed EPAM:

> Thank you for the executed LOI, we are excited to move forward. Although the agreement doesn't call for immediate exclusivity, we intend to move forward solely with EPAM. We are stopping discussions with all other companies, and are excited to enter due diligence. Please let us know next steps.

(*Id.* at ¶ 41.) CKSJB alleges that PointSource declined purchase offers from other companies. (*Id.* at ¶ 45.)

Between January and April of 2017, PointSource worked with EPAM as EPAM conducted due diligence. (*Id.* at ¶¶ 62–63.) On March 23, 2017, EPAM sent PointSource a draft Asset Purchase Agreement, which "mirrored the material terms of the deal set forth in the [IOI]." (*Id.* at ¶¶ 80, 82.) PointSource and EPAM's leadership teams then met twice in person to discuss the closing timeline and employee transitions. (*Id.* at ¶¶ 84–86.) During these meetings, "EPAM explicitly directed PointSource to treat the transaction as a done deal" and asked PointSource to "prepare to tell clients and employees" about the purchase. (*Id.* at ¶ 88.) In early April, "at EPAM's instruction," PointSource told key employees about the purchase and started to prepare them for the transition. (*Id.* at ¶ 92.)

On April 4, 2017, EPAM gave PointSource a timeline for closing, and PointSource sent EPAM its proposed edits to the Purchase Agreement. (*Id.* at ¶¶ 93, 100.) EPAM's timeline proposed an April 28 signing and mid-May closing. (*Id.* at ¶ 94.) PointSource's proposed edits to the Purchase Agreement did not alter material or financial terms. (*Id.* at ¶ 101.) The parties scheduled a call and meeting for April 12 and April 18, respectively, to finalize EPAM's due diligence and discuss integration. (*Id.* at ¶ 98.)

On April 5, EPAM proposed that the structure of the transaction change from an asset purchase to an equity purchase. (*Id.* at ¶ 104.) After a phone call with EPAM, PointSource agreed to the change. (*Id.* at ¶¶ 106–07.) EPAM said it would send a revised Purchase Agreement the following week. (*Id.* at ¶ 108.) On April 11, however, EPAM "notified PointSource by phone it was unilaterally and arbitrarily terminating its acquisition." (*Id.* at ¶ 111.)

II

The plaintiff bears the burden to establish standing under Article III of the United States Constitution by showing (1) it suffered an injury in fact, (2) the injury is fairly traceable to the defendant's challenged action and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A motion to dismiss for lack of standing is properly brought under Rule 12(b)(1) because standing is a jurisdictional matter. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)).

The Court must first determine whether a defendant's challenge to standing is facial or factual. *Constitution Party*, 757 F.3d at 357–58 (citing *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial attack contests the sufficiency of the pleadings, whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Constitution Party*, 757 F.3d at 358 (internal citations and quotation marks omitted). EPAM has not yet answered the Amended Complaint, so the Court must construe EPAM's Motion as a facial challenge. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891–92, 892 n.17 (3d Cir. 1977).

When presented with a facial challenge to standing, the Court "must only consider the allegations of the complaint and documents referenced therein and attached thereto." *Constitution Party*, 757 F.3d at 358 (quoting *In re Schering Plough*, 678 F.3d at 243). "Well-pleaded factual allegations are taken as true, and reasonable inferences are drawn in the plaintiff's favor." *Hendrick v. Aramark Corp.*, 263 F. Supp. 3d 514, 517 (E.D. Pa. 2017), *appeal dismissed*, 2017 WL 5664867 (3d Cir. Oct. 31, 2017) (citing *Constitution Party*, 757 F.3d at 357) ("When considering . . . a facial challenge, a court must apply the same standard of review that would apply on a motion to dismiss under Rule 12(b)(6)."). EPAM contends that CKSJB has not sufficiently alleged it is successor in interest to PointSource's claims against EPAM. Specifically, EPAM argues that the Amended Complaint does not show there was consideration for PointSource's assignment of the claims to CKSJB.

The Amended Complaint alleges that CKSJB became 100% owner of PointSource when PointSource was restructured for tax purposes on May 23, 2017. (Am. Compl.

6

¶¶ 5, 7.) PointSource's former owners, Christopher, Kassandra and Kevin Hugill, now own CKSJB. (*Id.* at ¶¶ 4, 7.) In response to EPAM's Motion, CKSJB points to the Assignment of Chose in Action attached to its Amended Complaint which "assigns to CKSJB . . . all claims, demands and cause of action of whatsoever kind and nature that Pointsource, LLC have had, now had or may have against EPAM." (Am. Compl. Ex. A.) The Assignment, dated May 23, 2017, expressly states it was executed "[i]n exchange for value received." (*Id.*) Accepting the Assignment and CKSJB's allegations as true and drawing all reasonable inferences in CKSJB's favor, CKSJB has sufficiently alleged it has standing to sue as PointSource's successor in interest.

### III

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). A complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation omitted). While a complaint need not include detailed facts, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

*Twombly* and *Iqbal* require the Court to take three steps to determine whether the complaint will survive a motion to dismiss. *See Connelly v. Lane Const. Corp.*, 809

F.3d 780, 787 (3d Cir. 2016). First, it must "take note of the elements the plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, where the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). The Court should "construe truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at 791.

A

EPAM first argues that the Amended Complaint does not sufficiently allege EPAM had a contractual duty to negotiate with PointSource in good faith. Under Pennsylvania law as predicted by the Third Circuit, an agreement to negotiate in good faith is a contract.[2] *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 130 (3d Cir.

---

[2] CKSJB contends that Delaware law applies to this claim. To determine whether Pennsylvania or Delaware law applies, the Court applies the choice of law rules of Pennsylvania, the forum state. *Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Pennsylvania law, the Court must first consider the substance of the state laws in question and look for actual, relevant differences between them. *Id.* (citing *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007)). If there is no conflict between them, the choice of law analysis is unnecessary. *Id.* (citing *Hammersmith*, 480 F.3d at 230).

The conflict, as CKSJB presents it, is that Pennsylvania's Supreme Court has not yet recognized a cause of action for breach of the duty to negotiate in good faith, whereas Delaware's Supreme Court has. Although Pennsylvania's Supreme Court has not held that the cause of action exists, the Third Circuit Court of Appeals predicts that if presented with the issue, Pennsylvania would recognize the claim. *See Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986). This Court is bound by the Third Circuit's interpretation of Pennsylvania state law. *See Clark Res., Inc. v. Verizon Bus. Network Servs., Inc.*, 2010 WL 4973342 at *5 (M.D. Pa. Dec. 1, 2010); *see also Largoza v. Gen. Elec. Co.*, 538 F. Supp. 1164, 1166 (E.D. Pa. 1982) ("[I]t is axiomatic that this court is bound by a decision of the Third Circuit predicating Pennsylvania law unless the state supreme court issues a contrary decision or it appears from a subsequent decision of the appellate courts that the court of appeals erred."). Finding no true conflict between Pennsylvania and Delaware law and presented with none by the parties, the Court will apply Pennsylvania law to CKSJB's claim.

8

1997) (citing *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986)).  The plaintiff must allege (1) the parties manifested intent to be bound by an agreement to negotiate in good faith, (2) the terms of the agreement were sufficiently definite to be enforced, (3) consideration was conferred and (4) the agreement was breached by bad faith conduct.  *Id.*

"In determining the parties' intentions concerning [a] letter of intent, we must examine the entire document and the relevant circumstances surrounding its adoption."  *Channel Home Ctrs.*, 795 F.2d at 299 (citations omitted).  The plaintiff may rely both on the letter and the defendant's course of conduct in arguing that the defendant agreed to negotiate with the plaintiff in good faith.  *Flight Sys., Inc.*, 112 F.3d at 131 (citing *Am. Leasing v. Morrison Co.*, 454 A.2d 555, 560 (Pa. Super. 1982)).  The Third Circuit has enforced a duty to negotiate in good faith even where both parties concede that the letter of intent is not a final agreement.  *Channel Home Ctrs.*, 795 F.2d at 298.

i

CKSJB argues that the IOI manifests the parties' mutual agreement to negotiate in good faith to enter a purchase agreement reflecting the IOI's material terms.  (Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Mem.") 14–18, ECF No. 29.)  CKSJB contends that the IOI expressly promises that EPAM will work diligently to close the transaction in an expedient manner and complete due diligence in approximately twelve weeks.  CKSJB also argues that EPAM's conduct after executing the IOI establishes its intent to be bound by those promises: in-person meetings with PointSource's leadership, intensive due diligence, production of a timeline for closing, drafting a detailed purchase

agreement and assuring PointSource that it should treat the transaction as a "done deal."

Contrary to CKSJB's assertions, the IOI does not include a promise by EPAM to negotiate in good faith. First and foremost, the IOI expressly states that it does not give rise to any legally binding obligation on EPAM, nor does any course of conduct by EPAM "relating to the negotiation of the terms of the transaction contemplated." (IOI 5, 6.) The document undoubtedly contains some optimistic language, including that EPAM's proposal "has the enthusiastic support of [EPAM's] senior management," EPAM "do[es] not foresee any issues that would prevent [EPAM] from consummating a transaction," EPAM is "prepared to move forward to perform [its] due diligence review and prepare definitive documentation, which [it] expect[s] can be completed in approximately twelve weeks," EPAM "may require a commitment of exclusivity by [PointSource]" and EPAM "would work diligently with [its] representatives and [PointSource's] team and representatives to close the transaction in an expedient manner." (IOI 3, 5.) Courts, however, routinely dismiss claims for breach of the duty to negotiate in good faith where the parties' letter of intent does not contain a specific promise by the defendant to do so, and nothing in the IOI contains such a promise. *See WP 851 Assocs., L.P. v. Wachovia Bank*, 2008 WL 114992 at *9 (E.D. Pa. Jan. 10, 2008); *Philmar Mid-Atl., Inc. v. York St. Assocs. II*, 566 A.2d 1253, 1255 (1989).

In addition to the contention that EPAM pledged in the IOI to negotiate in good faith, CKSJB alleges that EPAM orally agreed to do so. The Amended Complaint states that EPAM sent PointSource a draft IOI on January 10, 2017. (Am. Compl. ¶ 34.) It next alleges that, "[t]o assuage PointSource's fear of not finding a serious

contracting partner, PointSource called EPAM's President," who "expressly agreed with PointSource to work diligently and to negotiate in good faith to complete the deal." (*Id.* at ¶¶ 35–36.) PointSource also proposed changes to some of the IOI's proposed terms, and EPAM executed a final version of the IOI on January 19. (*Id.* at ¶¶ 37–39.)

Accepting CKSJB's allegations as true, EPAM's president's oral promise to negotiate in good faith cannot form the basis of a claim for breach of the duty to do so. The IOI, after EPAM made the changes requested by PointSource shortly after the alleged phone call between the parties, makes no mention of EPAM's alleged promise to negotiate in good faith; to the contrary, it expressly relieves EPAM from liability for anything (past, present or future) relating to the negotiation of the terms of the transaction. *See Lockheed Martin Corp. v. Bell Atl. Directory Graphics*, 1997 WL 698491 at *5 (E.D. Pa. Nov. 3, 1997) ("[A]ny argument that the parties intended to be so bound is negated by the parties' written agreement that [defendant] was not obligated to execute a definitive agreement."); *see also Brinich v. Jencka*, 757 A.2d 388, 400 (Pa. Super. 2000) (citing *McGuire v. Schneider, Inc.*, 534 A.2d 115, 117 (Pa. Super. 1987), *aff'd*, 548 A.2d 1223 (1988) ("Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by that contract.").

ii

Also fatal to CKSJB's claim is that the alleged agreement to negotiate in good faith is not specific enough to enforce. *See USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 265 (3d Cir. 1999). CKSJB contends that EPAM promised to negotiate in good faith to

11

induce PointSource to choose to move forward with EPAM.  This lacks the specificity of agreements to negotiate in good faith that have been deemed enforceable by courts applying Pennsylvania law.  *See, e.g.*, *Channel Home Ctrs.*, 795 F.2d at 299 (enforcing duty where defendant, "to induce the [plaintiff] to proceed with the leasing of [a] Store," agreed to "withdraw the Store from the rental market, and only negotiate the above described leasing transaction to completion"); *Flight Sys., Inc.*, 112 F.3d at 130 (vacating dismissal of claim where plaintiff alleged it agreed to remove property from the rental market while negotiating a lease agreement with defendant according to terms in a letter from defendant's broker).

The alleged agreement to negotiate in good faith, as described by PointSource, is not defined sufficiently enough for EPAM to have even breached.  *See Clark Res., Inc. v. Verizon Bus. Network Servs., Inc.*, 2011 WL 1627074 at *5 (M.D. Pa. Apr. 29, 2011) ("[A]n agreement to negotiate in good faith must include some 'framework' or 'objective criteria' by which a court can measure whether the agreement to negotiate in good faith has been breached."); *SodexoMAGIC, LLC v. Drexel Univ.*, 333 F. Supp. 3d 426, 459 (E.D. Pa. 2018), *appeal docketed*, No. 19-1107 (3d Cir. Jan. 14, 2019) ("[B]ecause there is no limiting principle against which a fact finder could measure [defendant's] 'good faith,' this Court is unable to recognize the existence of an enforceable agreement.").  Without a "'detailed' expression of the parties' intent," the Court cannot find an enforceable agreement.[3]  *USA Mach.*, 184 F.3d at 265.

---

[3] Having found that CKSJB does not sufficiently allege the first and second elements of its claim, the Court need not consider whether it sufficiently alleges consideration.  Because there is insufficient evidence of an agreement to negotiate in good faith, CKSJB's claim that PointSource elected to negotiate exclusively with EPAM as consideration for EPAM's promise "exists in a vacuum and is not tied to any specific agreement."  *See WP 851 Assocs., L.P. v. Wachovia Bank, N.A.*, 2009 WL 78160 at *2 (E.D. Pa. Jan. 8, 2009).

12

In sum, concrete negotiations between EPAM and PointSource over a potential transaction began, as they often do, with the parties entering into a Confidentiality Agreement so that EPAM would learn more about PointSource before opening up its checkbook. Here, the Confidentiality Agreement made clear that nothing about the process obligated EPAM to negotiate a definitive purchase agreement or even to continue negotiations if it didn't want to. Indeed, both EPAM and PointSource were free to break off discussions and walk away, no strings attached, whenever they desired. The expressly titled "Non-Binding Indication of Interest," reviewed, edited, and agreed to by PointSource, could not have been clearer. By its terms, EPAM's proposal was non-binding and preliminary. Whatever else it said or didn't say, the proposal vitiates, on its face, the arguments CKSJB now attempts to make.

CKSJB derides the document's broad disclaimers by putting the words "non-binding" in quotation marks and calling that language "generic." (Am. Compl. ¶¶ 60–61.) But words mean things—and "non-binding" means exactly that. This was a sophisticated commercial transaction, with legal counsel undoubtedly involved to the extent businesspeople would involve lawyers in a $24 to $34 million dollar deal. PointSource, perhaps because EPAM had made the most serious or highest proposal, decided to focus on doing a deal with EPAM—to the exclusion of all other purportedly interested parties. At the eleventh hour, for whatever reason, EPAM did what the documents governing the negotiations gave them the right to do—it walked away. PointSource then had to scramble to get another buyer who paid them a good bit less than they hoped to get from EPAM. PointSource, now via CKSJB, has every right to be

upset with being left at the altar. But it cannot circumvent the rules of a process it agreed to and willingly participated in and hope now to impose upon EPAM duties and obligations that EPAM repeatedly and expressly disavowed.

B

EPAM next argues that CKSJB fails to state a claim for promissory estoppel because EPAM could not have reasonably expected its statements or conduct to induce PointSource's action or forbearance and PointSource could not, in any event, have reasonably relied on those statements or conduct. Under Pennsylvania law, promissory estoppel is an "equitable remedy to a contract dispute . . . [that] makes otherwise unenforceable agreements binding." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). To invoke the doctrine, the plaintiff must show (1) the defendant made a promise and should have reasonably expected that promise to induce action or forbearance by the plaintiff, (2) the plaintiff actually took action or refrained from action in reliance on the promise and (3) injustice can be avoided only by enforcing the promise. *Dugan v. O'Hara*, 125 F. Supp. 3d 527, 539 (E.D. Pa. 2015) (citing *I.K. ex rel. B.K. v. Haverford Sch. Dist.*, 567 Fed. App'x 135, 137 (3d Cir. 2014)). The promise must be sufficiently clear to justify a finding that the promisor should have reasonably expected it to induce reliance. *Clark Res., Inc.*, 2010 WL 4973342 at *4 (citing *C & K Petrol. Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988)).

CKSJB alleges that an assortment of conduct and statements by EPAM satisfy the first element of its claim: the terms of the IOI, EPAM's president's alleged oral promise to negotiate in good faith, EPAM's assurances that due diligence was progressing positively, EPAM's execution of a draft purchase agreement and EPAM's

14

instruction to PointSource to treat the transaction as a done deal. (Pl.'s Mem. 22–23.) CKSJB argues that EPAM should have reasonably expected these assorted "promises" to induce action or forbearance by PointSource—namely, ending discussions with other companies looking to purchase PointSource, declining other purchase offers and negotiating exclusively with EPAM. (*Id.* at 23.)

CKSJB has not plausibly alleged that EPAM should have reasonably expected its conduct or statements to induce PointSource to negotiate with EPAM exclusively. The Amended Complaint alleges that both parties intended the IOI to "re-establish" their oral agreement to negotiate in good faith. (Am. Compl. ¶ 48.) PointSource had an opportunity to review and request changes to the IOI before EPAM sent the final version. (*Id.* at ¶¶ 37–39.) Yet the IOI did not promise PointSource anything, nor did it prevent PointSource from negotiating with others. *See supra* Section III.A. Instead, it states that "[g]iven the significant amount of time, expense and focus required by EPAM [to conduct due diligence] . . . , [EPAM] *may* require a commitment of exclusivity." (IOI 5 (emphasis added).) PointSource acknowledged this unambiguous language in an email to EPAM the day it received the IOI: "Although the agreement doesn't call for immediate exclusivity, we intend to move forward solely with EPAM. We are stopping discussions with all other companies." (Am. Compl. ¶ 41.)

CKSJB then contends that EPAM "did not object" to PointSource's (admittedly unilateral) decision to break off negotiations with all other suitors and that EPAM "did not tell PointSource its reliance on EPAM was misplaced or in any way inappropriate." (*Id.* at ¶¶ 42–43.) Otherwise stated, CKSJB alleges that PointSource, knowing that EPAM did not require a commitment of exclusivity, nonetheless made its own business

15

decision to put all its eggs in the EPAM basket. It then attempts to impose an affirmative duty on EPAM to object to PointSource's unilateral decision and step in to save PointSource from itself. When EPAM chose not to assume such an obligation, EPAM apparently became responsible for the consequences of PointSource's own strategy. Nothing EPAM is alleged to have said or done could have been reasonably expected to induce PointSource to voluntarily give up its ability to negotiate with other potential purchasers and PointSource's decision to do so could in no way have been a result of reasonable reliance on any "promise" by EPAM.

C

EPAM also argues that CKSJB has not sufficiently pled that it was damaged by EPAM's alleged breach of the Confidentiality Agreement. The Amended Complaint states that sometime in March of 2017, PointSource learned that one of EPAM's senior executives disclosed EPAM's plan to purchase PointSource to one of PointSource's former clients. (Am. Compl. ¶ 118.)

Under Delaware law, a claim for breach of contract requires (1) the existence of a contract, (2) the breach of an obligation imposed by the contract and (3) resultant damage to the plaintiff.[4] *HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp. 2d 617, 620 (D. Del. 2006) (quoting *VLIW Tech., L.L.C. v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

The Confidentiality Agreement does not provide for liquidated damages in the event of a breach, though it does allow for injunctive relief in the event an aggrieved party cannot be made whole by monetary damages. (Agreement ¶ 8.) Accordingly, to

---

[4] The parties agree that pursuant to the Confidentiality Agreement's choice of law clause, this claim is governed by Delaware law. *See* (Agreement ¶ 12).

16

state a claim for breach of contract, CKSJB must otherwise allege that PointSource suffered resultant harm from EPAM's purported disclosure. The Amended Complaint alleges that EPAM's breach "threatened material adverse effects on PointSource's business" and caused PointSource "material financial and reputational harm." (Am. Compl. ¶¶ 120, 161.) In its response to EPAM's Motion, CKSJB tries to bolster these allegations by arguing that EPAM's breach preceded its withdrawal from purchase negotiations, which forced PointSource to accept a less beneficial deal. (Pl.'s Mem. 24.) The Amended Complaint, however, does not aver a connection between EPAM's alleged breach of confidentiality and withdrawal from the deal, nor does it purport to set forth how, under CKSJB's apparent theory of the case, EPAM allegedly telling someone else about the negotiations would have caused EPAM to pull out. *See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint.").

The Amended Complaint states that PointSource became aware of the breach in March of 2017 while purchase negotiations were in progress; it does not allege that PointSource complained to EPAM or that the breach played a role in EPAM's withdrawal from those negotiations. (Am. Compl. ¶ 118.) To the extent that CKSJB can allege any facts which could show EPAM's alleged breach resulted (as opposed to "threatened") in material adverse effects on PointSource's business or played a role in its decision to cease negotiations, CKSJB may amend its Complaint accordingly.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.